**UNITED STATES of America, Plaintiff,**

v.

**Jason S. KEARNS, Defendant.**

**No. 99–40081–01–RDR.**

United States District Court, D. Kansas.

July 5, 2000.

---

David J. Phillips, Office of Federal Public Defender, Topeka, KS, for Jason S Kearns, defendant.

James A. Brown, Anthony W. Mattivi, Office of U.S. Attorney, Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This matter is presently before the court upon several pretrial motions filed by the defendant. The court has conducted a hearing on these motions and is now prepared to rule.

The defendant is charged in a one-count indictment. The grand jury charges that from an unknown date beginning sometime prior to December 30, 1998 until on or about March 1, 1999, the defendant manufactured in excess of 500 grams of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

## MOTIONS TO SUPPRESS/MOTION TO DISMISS FOR DESTRUCTION OF EVIDENCE

The defendant has filed three motions to suppress and a motion to dismiss for destruction of evidence. The court heard evidence on all of these motions. The court now makes the following findings of fact and conclusions concerning these motions.

*Findings of Fact*

1. On December 30, 1998, Kenneth Massey, the Undersheriff with the Douglas County Sheriff's Office, was part of a group of officers executing a search warrant at an apartment complex in Lawrence, Kansas. During the execution of the warrant, the defendant arrived on the scene in a pickup truck. Officer Massey talked briefly with him. Officer Massey asked the defendant if he could search his truck. The defendant agreed and Officer Massey found a set of triple beam scales. Officer Massey seized the scales. The officers then completed their search at the apartment complex and left the area.

2. Officer Massey arrived at his home in Eudora, Kansas at approximately 3:00 a.m. The defendant arrived at Massey's home at the same time. Officer Massey and the defendant then conversed for several minutes. The defendant asked if Officer Massey was interested in obtaining some information. Officer Massey indicated that he wanted to know "where the meth lab was." The defendant then asked if "we were off the record." Officer Massey said that depended on what he was going to say. The defendant responded, "Well, how about my meth lab?" Officer Massey then told the defendant that they were not off the record. The defendant then told him about the location of his methamphetamine laboratory. He informed Officer Massey that earlier in the day he had left two boxes containing materials used in the manufacture of methamphetamine near a Honda automobile in the parking lot of the apartment complex where the search warrant had been executed. Officer Massey called other officers in Lawrence and gave them the information that the defendant had provided. They were unable to find the boxes. Officer Massey then contacted the defendant at the defendant's residence in Eudora at about 5:00 a.m. He asked for additional information on the whereabouts of the boxes. The defendant provided that information and the boxes were ultimately found.

3. The boxes contained chemicals and devices used in the manufacture of methamphetamine. The materials found in the boxes were ultimately destroyed pursuant to court order. The chemicals and materials were destroyed due to their danger. The decision as to what items were to be destroyed was made by members of the Drug Enforcement Administration (DEA). Prior to the destruction, some samples were taken of the chemicals. In addition, photographs of the items were made.

4. On January 8, 1999, Officer Massey and Patrick Pollock, a sheriff's deputy with Douglas County Sheriff's Office, went to the residence of defendant's mother at 803 Maple in Eudora, Kansas to serve a misdemeanor criminal trespass warrant on the defendant. Deputy Pollock was with the Douglas County Drug Enforcement Unit at this time. The defendant answered the door at the residence. Officer Massey informed the defendant that he needed to discuss a warrant with him. The defendant allowed them entry into the house.

5. The officers and the defendant talked briefly in the living room, and then Officer Massey asked to use the bathroom. The defendant agreed. Officer Massey left the living room and walked to the bathroom. During his trip to the bathroom, Officer Massey noticed two cans of Coleman fuel in a storage room near the bathroom. The sight of the fuel was significant to Officer Massey because he was aware that it was one of the ingredients used in making methamphetamine. Upon entry into the house, he had noticed a chemical smell in the house.

6. After using the bathroom, Officer Massey returned to the living room and asked the defendant for consent to search the house. The defendant agreed to the request and then signed a consent form. The defendant requested that Officer Massey not disturb anything in his mother's bedroom, and Officer Massey agreed to restrict the search to avoid his mother's bedroom. The form signed by the defendant allowed Officer Massey and Deputy Pollock to search the southwest bedroom of the house, the area where Officer Massey saw the Coleman fuel cans. The defendant also signed a consent form allowing a search of a shed on the property. Each consent form was signed just below the following statement: "This written permission is being given by me to the above named deputies voluntarily and without any threats or promises of any kind."

7. During this conversation, the defendant was coherent and responded appropriately to the questions asked by officer Massey. He appeared tired, but not under the influence of alcohol or drugs. The

defendant had informed Officer Massey that he had been up for several days. Officers Massey and Pollock were very calm during the encounter. They did not raise their voices or issue any commands, directive or threats. Officer Massey was armed, but he did not use his weapon at any time.

8. Following the search of the residence, Officer Pollock gave the defendant a Miranda warning. The defendant indicated that he understood the warning. He subsequently signed a form indicating that he understood his rights and that no promises, threats, pressure or coercion had been used against him. He then admitted to Deputy Pollock that he was aware that the items in the house had been used for the manufacture of methamphetamine and that he had cooked methamphetamine on previous occasions.

9. On March 1, 1999, Walt Thrower, a special agent with the DEA, went to a residence outside of Council Grove, Kansas to serve a state parole violation warrant on the defendant. Agent Thrower went into the garage at the residence and encountered the defendant. The defendant had a hypodermic needle in his hand. Agent Thrower identified himself and ordered the defendant to the ground at gun point. Agent Thrower noticed the components of a methamphetamine laboratory in the garage. He gave the defendant a Miranda warning. He then asked the defendant about the materials found in the garage. The defendant acted and responded appropriately. He did not appear to be under the influence of the methamphetamine. Agent Thrower believed that the defendant was about to inject methamphetamine when he appeared in the garage. The defendant discussed his prior methamphetamine manufacturing activities with Agent Thrower. Agent Thrower wrote down the comments made by the defendant, and the defendant signed them.

10. The evidence seized from the garage was also destroyed. The chemicals and their containers were destroyed because of their hazardous nature. Samples of some of the chemicals were taken prior to destruction. Photographs of the materials seized were also taken.

11. On March 10, 1999, Officer Massey received a letter from the defendant. The defendant had written this letter in the Morris County Jail and mailed it to Officer Massey. The letter was titled, "How to Ruin Your Life and Break the Hearts of Everyone Who Loves You." The letter contained very thorough instructions, complete with hand-drawn pictures, for the manufacture of the methamphetamine. In the letter the defendant stated: "I know this will be construed as evidence and used in my prosecution...."

*Conclusions of Law*

1. The defendant seeks to suppress statements he made to Officer Massey on December 30, 1998 while at Officer Massey's residence, and the statements contained in the letter he wrote to Officer Massey from the Morris County Jail on March 9, 1999. The defendant contends that these statements were either made "off the record" or in the context of plea negotiations.

2. The court finds no support, either factually or legally, for the contentions of the defendant. As indicated above, the court has determined that Officer Massey did not agree to talk to the defendant about the defendant's methamphetamine laboratory "off the record." The court recognizes that the defendant testified that he believed he had reached an agreement with Officer Massey that his statements concerning his laboratory would be "off the record." The court found the testimony of Officer Massey on this issue more credible.

The court also finds no merit to defendant's suggestion that his statements were made during the course of plea negotiations. "Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6) provide that statements made in the course of plea discussions between a criminal defendant and a prosecutor are

inadmissible against the defendant." *United States v. Mezzanatto,* 513 U.S. 196, 197, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995). "By [their] plain language, the rule[s] exclude[ ] only those statements which are made 'in the course of plea discussions.'" *United States v. Lloyd,* 43 F.3d 1183, 1186 (8th Cir.1994) (quoting Fed.R.Crim.P. 11(e)(6)(D)). Statements voluntarily offered either before any plea negotiation has begun or after a plea agreement has been reached cannot be considered statements made "in the course of plea discussions" within the meaning of the exclusionary rules. *See id.* ("once a plea agreement has been reached, statements made thereafter are not entitled to [exclusion]"); *United States v. White,* 617 F.2d 1131, 1134 (5th Cir.1980) (statements made as mere "cooperation negotiations" were not subject to exclusion as plea discussions). A statement is made in the course of plea discussions with a United States Attorney if (1) the suspect exhibited an actual subjective expectation that he was negotiating a plea at the time of the discussion, and (2) his expectation was reasonable given the totality of the circumstances. *See United States v. Leon Guerrero,* 847 F.2d 1363, 1367 (9th Cir.1988). To determine whether an accused's statements were made "in the course of plea discussions" within the meaning of Rule 11(e)(6)(D) and Rule 410, the court must look to the specific facts of each case and examine "the totality of the surrounding circumstances." *Lloyd,* 43 F.3d at 1186.

■ There is nothing to suggest that the defendant and Officer Massey were engaged in plea negotiations. Officer Massey and the defendant had no discussion concerning a possible plea agreement by the defendant. Further support for the determination that the conversations between Officer Massey and the defendant were not "off the record" or part of plea negotiations is found in the contents of the letter of March 10, 1999. In that letter, the defendant acknowledged that the information he was providing would be used

against him in his prosecution. Such an open admission is contrary to the position that the defendant now takes. Accordingly, we find that the statements made by the defendant on December 30, 1998 and the letter written by the defendant in March 1999 are admissible. The defendant's motion to suppress concerning these matters must be denied.

3. The defendant next seeks to suppress the evidence, including his statements, that was obtained as a result of the search of his mother's residence on January 8, 1999. The defendant contends that (1) Officer Massey's "pretextual presence at the residence" was the "first Fourth Amendment violation;" (2) the officers illegally entered the defendant's home because he did not voluntarily consent to their presence; and (3) he did not voluntarily consent to a search of his residence.

■ 4. The defendant initially argues that the officers' stated reason for being at his mother's residence to serve a misdemeanor warrant for criminal trespass was "an obviously pretextual contact," and that this affects the validity of the subsequent search. We must disagree. "The subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis." *United States v. Sanchez,* 89 F.3d 715, 718 (10th Cir.1996).

5. The defendant next contends that the officers gained illegal entry to his mother's residence because he did not give them consent to enter. The defendant also asserts that the consent to search the residence was involuntary because (1) he was tired and sick after being awakened from sleep after days of trying to stop using methamphetamine; and (2) Officer Massey threatened to "tear the house apart" if consent was not given.

■ 6. Consent to enter and consent to search are governed by the same standards. *See Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Illinois v. Rodriguez,* 497 U.S. 177,

188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Any consent must be voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Id.* A court makes this determination without presuming the consent was voluntary or involuntary. *United States v. Hernandez,* 93 F.3d 1493, 1500 (10th Cir.1996). The burden is upon the government to prove the consent was voluntary. *United States v. Patten,* 183 F.3d 1190, 1194 (10th Cir.1999). "The government must show there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *Hernandez,* 93 F.3d at 1500 (citations omitted).

7. The evidence demonstrated that the defendant voluntarily consented to the officers' entry into the residence. The defendant admitted in his testimony that he either expressly or implicitly allowed the officers to come into the house. He made no suggestion that he was coerced into allowing them entry. Accordingly, we find no merit to this contention.

8. The court also finds no merit to the defendant's assertion that his consent to search was not voluntary. The defendant not only orally agreed to the searches, but also signed written forms allowing the searches. The court is not persuaded that the defendant did not understand what he was doing. The court found the officers' testimony on the voluntariness of the defendant's consent credible. Moreover, we are not convinced that Officer Massey threatened to tear up the house if consent was not given. In sum, the court finds that no Fourth Amendment violations occurred during the search and seizure of property at 803 Maple in Eudora, Kansas on January 8, 1999.

9. Finally, the defendant seeks to suppress statements he made to officers at the Council Grove residence on March 1, 1999.

He contends that these statements were involuntary. He suggests that they were involuntary because he was "under the influence of methamphetamine at the time of the interview."

10. The standard for voluntariness of a waiver is the same as the standard for voluntariness of a confession. *Colorado v. Connelly,* 479 U.S. 157, 169–170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The government must prove by a preponderance of the evidence that a defendant's waiver and confession were voluntary. *Id.* at 168, 107 S.Ct. 515. In assessing the validity of a waiver, courts analyze the totality of the circumstances surrounding the interrogation. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). An express waiver is usually strong proof of the validity of that waiver. *United States v. Hack,* 782 F.2d 862, 866 (10th Cir.1986).

11. The court does not find that the evidence supports the defendant's contention that the statements he made on March 1, 1999 were involuntary because he was under the influence of methamphetamine at the time he made them. At the time Agent Thrower entered the garage at the residence in Council Grove, the defendant was preparing to inject methamphetamine. There was no evidence offered that he had previously injected methamphetamine on that day. The defendant responded appropriately to the questions of Agent Thrower and appeared coherent. He did not appear to be under the influence of any substance. Moreover, the defendant signed a statement on that day indicating that he was "preparing to do a shot" when law enforcement officers arrived. The court finds that the statements made by the defendant on that date were voluntary and are therefore admissible.

12. The motions to suppress filed by the defendant are denied.

13. The defendant seeks dismissal of the charges against him because many of the materials alleged to be associated with

the manufacture of methamphetamine were destroyed by law enforcement officers. The defendant asserts that the destruction of these items precludes him from conducting independent testing and analysis to test the allegations contained in the indictment. The defendant argues in particular that it will be difficult for him to contest the allegation that he manufactured in excess of 500 grams of methamphetamine.

14. In *United States v. Parker*, 72 F.3d 1444, 1451 (10th Cir.1995), the Tenth Circuit set forth the standards for consideration of a motion to dismiss based upon destruction of evidence as follows:

> Under the Due Process clause of the Fourteenth Amendment, the Supreme Court has developed " 'what might loosely be called the area of constitutionally guaranteed access to evidence.' " *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984) (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982)). The Court has specified that, to the extent the Constitution imposes a duty upon the government to preserve evidence, "that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense"—i.e., evidence that is constitutionally material. *Id.* at 488–89, 104 S.Ct. at 2533–34. To be constitutionally material, evidence must: (1) "possess an exculpatory value that was apparent [to the police] before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. at 2534. The mere possibility that lost or destroyed evidence could have exculpated a defendant is not sufficient to satisfy *Trombetta's* requirement that the exculpatory value be "apparent" to the police before destruction. *Arizona v. Youngblood*, 488 U.S. 51, 56, n. *, 109 S.Ct. 333, 336, 102 L.Ed.2d 281 n.

*(1988). Additionally, "if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *[United States v.]. Bohl*, 25 F.3d [904] at 910 [ (10th Cir.1994) ] (citing *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337). "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith." *Id.* at 912.

█ 15. The defendant failed to successfully demonstrate that the evidence possessed an exculpatory value that was apparent to law enforcement prior to destruction. Accordingly, if the evidence is only "potentially useful" for the defense, then the defendant must also show that the government acted in bad faith. The defendant failed to make this showing as well. The evidence showed that these materials were destroyed because of their hazardous and volatile nature. This is, of course, a valid basis for the actions of the law enforcement officers. We note, in addition, that the overall circumstances also fail to suggest bad faith by the government. Samples of a number of the seized chemicals were taken and photographs were taken of all of the seized materials. The evidence also shows that the materials were destroyed pursuant to court order or departmental policy. In sum, the defendant's motion to dismiss must be denied.

## MOTION TO DISMISS BASED ON DUPLICITY

█ The defendant seeks to dismiss the indictment, arguing that it is duplicitous. The defendant contends it is duplicitous because three separate incidents have been combined to form one charge. The defendant suggests that this circumstance may cause a problem in obtaining a unanimous jury verdict and in sentencing.

The government contends that the charge is not duplicitous because there was

an "uninterrupted concurrence of single unchanged intent and action over a period of time." The government suggests that the defendant has admitted that he was involved in the manufacture of methamphetamine from at least December 29, 1998 to March 1, 1999. The government asserts that the dangers of duplicity can be avoided in this case due to the following circumstances: (1) the defendant is aware of the instances that are included in the substance of the charge; and (2) a unanimity instruction can cure an otherwise duplicitous indictment.

 A duplicitous indictment charges the defendant with two or more separate offenses in the same count. *United States v. Trammell,* 133 F.3d 1343, 1354 (10th Cir.1998). "The dangers of duplicity are three-fold: (1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) a defendant may be prejudiced in a subsequent double jeopardy defense; and (3) a court may have difficulty determining the admissibility of evidence." *United States v. Wiles,* 102 F.3d 1043, 1061 (10th Cir.1996). "The acts of the defendant need not be separated into separate counts when they represent a single, continuing scheme if the following dangers are not present: 1) the defendant may not be notified of the charges against him, 2) he may be subject to double jeopardy, 3) he may be prejudiced by evidentiary rulings at trial, and 4) he may be convicted by less than a unanimous verdict." *United States v. Robin,* 693 F.2d 376, 378 (5th Cir.1982).

The court is not persuaded that a duplicity problem exists here. As suggested by the government, the evidence appears to show that the defendant was engaged in a single scheme to manufacture methamphetamine over a short period of time. The court is further convinced that any problems can be cured with appropriate instructions. Accordingly, this motion is denied.

## MOTION TO DISMISS FOR MISCONDUCT BEFORE THE GRAND JURY

The defendant's argument on this motion is as follows:

The indictment handed down by the grand jury charges Mr. Kearns with manufacturing in excess of 500 grams of methamphetamine. However, the laboratory reports provided to defense counsel indicate that less than four grams of a mixture of (sic) substance containing methamphetamine could be produced from the chemical seized on three separate occasions. The only possible source for the allegation of over 500 grams was a statement allegedly made by Mr. Kearns on March 1, 1999. However, that statement is quite obviously unreliable. *See,* "Motion to Suppress March 1, 1999 Statement."

The court has previously determined that the March 1, 1999 statement is not unreliable. Accordingly, this motion must be denied.

## MOTION FOR DISCLOSURE OF 404(b) EVIDENCE

The defendant seeks an order requiring the government to provide him with notice of all evidence that the government seeks to introduce under Fed.R.Evid. 404(b). The government has responded that, other than the facts recited in the police reports, it is not aware of any Rule 404(b) evidence it intends to offer at the trial of this case. The government further indicates that it will provide any such information if it becomes available or known to it. With this response, this motion is denied as moot.

## MOTION FOR PRE–PLEA PRESENTENCE REPORT

The defendant seeks an order directing that a pre-plea presentence report be prepared. The defendant asserts that he cannot make an informed plea until he knows the amount of drugs with which he will be charged. He suggests that the government and he have been engaged in plea negotiations, but they are at an impasse concerning the amount of drugs involved.

This motion is denied. The court is not persuaded that this procedure is appropriate. Moreover, we have some concerns about initiating this as a standard practice.

**IT IS THEREFORE ORDERED** that defendant's motion to dismiss based on duplicity (Doc. # 20) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion to suppress evidence and statements (Doc. # 22) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion for disclosure of 404(b) evidence (Doc. # 23) be hereby denied as moot.

**IT IS FURTHER ORDERED** that defendant's motion to suppress March 1, 1999 statement (Doc. # 24) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion to dismiss for destruction of evidence (Doc. # 25) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion to suppress evidence seized from 803 Maple, Eudora, KS (Doc. # 26) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion to dismiss for misconduct before the grand jury (Doc. # 27) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion for pre-plea presentence report (Doc. # 40) be hereby denied.

**IT IS SO ORDERED.**